Filed 6/26/23  Tulare Lake Canal Co. v. Sandridge Partners CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TULARE LAKE CANAL COMPANY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SANDRIDGE PARTNERS L.P. et al.,<br><br>Defendants and Appellants. | F084439<br><br>(Super. Ct. No. 22C0019)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[No Change in Judgment] |

**THE COURT:**

It is ordered that the opinion filed herein on June 7, 2023, be modified as follows:

1.  On page 2, in the third full paragraph, the first sentence beginning "Based on" is deleted and the following sentence inserted in its place:

> Based on the terms of the agreement, we conclude the trial court did not err when it concluded TLCC demonstrated it was likely to prevail on the merits of its claim that Sandridge inappropriately invaded the canal.

2.  On page 3, in the second full paragraph, the fifth sentence beginning "Sandridge Partners owns" is modified to read:

> Sandridge Partners owns and farms several properties in Kings County, raising pistachios, wheat, alfalfa, and cotton.

3. On page 3, in the third full paragraph, the last sentence beginning "For ease of reference" is modified to read:

> For convenience, this opinion usually refers to the parcels as being owned by Sandridge.

4. On page 4, at the end of the partial paragraph at the top of the page, after the sentence ending "on land owned by Sandridge" add the following sentence:

> Thus, Sandridge asserts it is the fee owner of the dirt that forms the canal and embankments.

5. On page 10, in the third full paragraph, the last sentence beginning "This goal also" is deleted and the following sentence inserted in its place:

> The requirement that a deposit, bond, or undertaking be posted also protects the restrained party from the damage caused by a wrongfully issued injunction.

6. On page 13, in the second full paragraph the first sentence beginning "The April order" is deleted and the following sentence inserted in its place:

> In the April order, the trial court applied the interrelated factors test for preliminary injunctions and concluded (1) TLCC had demonstrated a likelihood of prevailing on its claim that it was inappropriate for Sandridge to cut into the banks of the canal without TLCC's permission, and (2) the weighing of the respective harms supported issuing a preliminary injunction upon TLCC's posting of an $800,000 bond.

7. On page 13, the third full paragraph beginning "The trial court's June order" is deleted and the following paragraph inserted in its place:

> The trial court's June order denying the motion to dissolve the preliminary injunction set forth a narrower rationale for issuing the preliminary injunction and tempered the trial court's earlier use of the term "exclusive." Despite this narrower rationale, we consider whether Sandridge has demonstrated the grounds set forth in the April 2022 order contains prejudicial error. In particular, we consider whether Sandridge has carried its burden on appeal and demonstrated TLCC did not have an exclusive right to maintain the canal—a right that is distinguishable from a right to exclude persons from being physically present in the right of way.

2.

8. On page 16, in the third full paragraph, the last sentence beginning "Those are the rules" is modified to read:

Those rules apply to deeds and contracts generally.

9. On page 20, in the first full paragraph, the second sentence beginning "In this case" is deleted and the following sentence inserted in its place:

In this case, that context includes the whole of the 1915 Agreement and the law as it existed when the agreement was drafted and signed.

10. On page 22, in the second full paragraph, the third sentence beginning "In particular" is modified to read:

In particular, Sandridge and its expert, Charles A. Hansen, offered no interpretation of the word "maintaining," the modifying phrase "in all ways," or the phrases in the recital that use "all" and "in full."

11. On page 22, the third full paragraph is deleted and the following paragraph inserted in its place:

We note that Sandridge's appellate briefing relies heavily on case law involving easements, including *Colegrove Water Company v. City of Hollywood* (1907) 151 Cal. 425. In that case, a fee title owner that wanted to upgrade its water delivery system was allowed to lay a new water pipe under the city's right of way for a public street, "subject to a provision against unnecessary injury to the street and avenue and obstruction of travel thereon." (*Id.* at p. 428). The usefulness of *Colegrove Water Company* and the other cases relied upon by Sandridge is limited because the fundamental question here involves the interpretation of the terms of the 1915 Agreement. "It is fundamental that the language of a grant of an easement determines the scope of the easement." (*County of Sacramento v. Pacific Gas & Elec. Co.* (1987) 193 Cal.App.3d 300, 313.) Sandridge's cases do not address the meaning of the contractual language at issue in this appeal and, thus, have little value as precedent.

12. On page 27, above **Disposition**, add the following:

**IV.     Petition for Rehearing**

Sandridge filed a petition for rehearing contending a rehearing is mandatory under Government Code section 68081 because the decision affirming the preliminary injunction was based on issues not raised or

3.

briefed by the parties.  As explained below, we conclude a rehearing is not required.  Consequently, the petition is denied.

### A.    Applicable Law

Sandridge's petition raises questions about the interpretation and application of Government Code section 68081, which provides in full:

> "Before the Supreme Court, a court of appeal, or the appellate division of a superior court renders a decision in a proceeding other than a summary denial of a petition for an extraordinary writ, based upon an *issue* which was *not proposed or briefed* by any party to the proceeding, the court shall afford the parties an *opportunity* to present their views on the matter through supplemental briefing.  If the court fails to afford that opportunity, a rehearing shall be ordered upon timely petition of any party."  (Italics added.)

Sandridge's rehearing petition quotes from *People v. Alice* (2007) 41 Cal.4th 668 (*Alice*), a case where our Supreme Court explained the application of Government Code section 68081.  Sandridge's petition— consistent with its approach throughout this appeal—omits relevant principles set forth in *Alice* that are unfavorable to its position.  These principles explain the meaning of the statutory terms we italicized above.

> "[Government Code s]ection 68081 does not require that a party actually have briefed an issue; it requires only that the party had the opportunity to do so.  By requiring the parties to file opening and responding briefs, the California Rules of Court automatically give the parties the opportunity to brief every issue that is raised in the appeal.  (Cal. Rules of Court, rule 8.200(a)(1).)  Further, we hold that this also gives the parties the opportunity to brief any issues that are fairly included within the issues actually raised."  (*Alice*, *supra*, 41 Cal.4th at p. 677.)

Later in *Alice*, the high court expanded its explanation of the statute's meaning by stating:

> "The parties need only have been given an opportunity to brief the issue decided by the court, and the fact that a party does not address an issue, *mode of analysis*, or authority that is raised or *fairly included* within the issues raised does not implicate the protections of [Government Code] section 68081."  (*Alice*, *supra*, 41 Cal.4th at p. 679, italics added.)

4.

The application of the term "fairly included" is illustrated by *Save Laurel Way v. City of Redwood City* (2017) 14 Cal.App.5th 1005—a case in which the First Appellate District concluded that justiciability is present in every case and the issue of ripeness was fairly included within the appellant's argument that the planned development permit did not violate the Subdivision Map Act. (*Save Laurel Way*, at p. 1015, fn. 9.) As a result, the court denied the request to submit supplemental briefs on the ripeness issue. (*Id*. at p. 1015.) A further illustration of an issue fairly included in the issues raised is the question of the proper standard of review, which is present in every case. (*Alice*, *supra*, 41 Cal.4th at p. 675.)

In our view, our Supreme Court's term "fairly included" is the equivalent of the term "fairly encompassed" used in other published decisions. (*Church Mutual Ins. Co., S.I. v. GuideOne Specialty Mutual Ins. Co.* (2021) 72 Cal.App.5th 1042, 1055, fn. 2 [existence of agency relationship fairly encompassed in the main issue raised in the appeal]; *Gee v. Greyhound Lines, Inc.* (2016) 6 Cal.App.5th 477, 487, fn. 6 [rehearing not required]; *Dieckmeyer v. Redevelopment Agency of Huntington Beach* (2005) 127 Cal.App.4th 248, 250, fn. 1; see Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2022) ¶¶ 11:43 to 11:43.3, pp. 11-14 to 11-16 [limitation on discussion of unbriefed issues].) Consequently, an issue is "proposed" for purposes of Government Code section 68081 when it is fairly included or encompassed in the broader issues raised in the appeal.

## B. Application of the Fairly Included Standard

Sandridge's rehearing petition did not acknowledge the existence of the fairly included standard or some of the other principles set forth in *Alice* that are relevant to the meaning of the statutory term "proposed." As a result, Sandridge's petition contains no analysis of how that standard applies to the specific questions it contends require supplemental briefing. Based on Sandridge's approach, we need not provide a detailed analysis of the application of that standard to those questions. Our constitutional obligation to provide a decision "in writing with reasons stated" (Cal. Const., art. VI, § 14) is satisfied by setting forth our conclusions as to the application of that standard.

The main issue in this appeal is the parties' respective rights and obligations relating to the canal and its operation. Those respective rights and obligations are set forth in the 1915 Agreement. Therefore, issues relating to the interpretation of that document are fairly included in the main issue raised in this appeal. It follows that Sandridge had the opportunity to address the rules of law that apply to the interpretation of the

provisions in the 1915 Agreement as well as the meaning of particular words, phrases, and provisions in that agreement. First, the rules of law, which we referred to as the traditional framework and the standard analysis, provide the "mode of analysis" as that term is used in *Alice*. Second, the importance of the text of the agreement is illustrated by the documents TLCC and Sandridge filed in the trial court and by TLCC's respondent's brief. On pages 17 and 27, that brief quoted the phrase "in all ways maintaining." Furthermore, TLCC referred to the 1915 Agreement in the trial court and argued it clearly "holds an easement on the property and owns the canal on that easement; it is looking possible the interest [TLCC] holds might be superior to a mere easement." To summarize, Sandridge, in its role as the appellant with the burden of demonstrating trial court error, had the opportunity to address what rules of law applied to the interpretation of the 1915 Agreement and how the language in the 1915 Agreement should be interpreted. The fact Sandridge did not take advantage of that opportunity does not entitle it to a rehearing.

### C. Provisions Not Mentioned

Sandridge also contends this court "did not consider key provisions in the 1915 Agreement" because those provisions were not mentioned in the original opinion. Those provisions are the "FIFTH" and "EIGHTH" paragraphs of the 1915 Agreement. The fact the opinion did not refer to these paragraphs does not mean this court did not consider those paragraphs. They were considered and we were not convinced they *explicitly stated* Sandridge could interfere with TLCC's rights, including the right to maintain the canal, by trenching across the canal to install a pipeline. Accordingly, those paragraphs were not mentioned. (See *People v. Garcia* (2002) 97 Cal.App.4th 847, 853–854.) Their roles, if any, in defining the respective rights and obligations of the parties are questions that can be addressed in the trial court when a decision on the merits is rendered.

Except for the modifications set forth, the opinion previously filed remains unchanged. There is no change in the judgment.

Appellants' petition for rehearing is denied.

6.

                                                        PEÑA, J.

WE CONCUR:


DETJEN, Acting P. J.


MEEHAN, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TULARE LAKE CANAL COMPANY, | F084439 |
| Plaintiff and Respondent, | (Super. Ct. No. 22C0019) |
| v. | |
| SANDRIDGE PARTNERS L.P. et al., | **OPINION** |
| Defendants and Appellants. | |

-ooOoo-

APPEAL from orders of the Superior Court of Kings County.  Valerie R. Chrissakis, Judge.

Whitney, Thompson & Jeffcoach, Marshall C. Whitney, Kristi D. Marshall; McCormick, Barstow, Sheppard, Wayte & Carruth and Scott M. Reddie for Defendants and Appellants.

Herr Pedersen & Berglund, Leonard C. Herr and Ron Statler for Plaintiff and Respondent.

-ooOoo-

Sandridge Partners, L.P. and Roller Land Company, Inc., (collectively, Sandridge) want to extend their water conveyance system by installing a 48-inch irrigation pipeline

on a route that crosses the Tulare Lake Canal. The canal is located within a 125-foot-wide right of way on land owned by Sandridge. Crossing the canal involves trenching through its banks and channel, laying the pipeline, and then reconstructing the banks and channel where the trench was cut. The owner of the right of way and operator of the canal, Tulare Lake Canal Company (TLCC), filed a trespass action against Sandridge, requesting a preliminary injunction to stop the trenching and installation of the pipeline across the canal.

The trial court granted the preliminary injunction after determining TLCC was likely to prevail on the merits and the balance of relative harms favored issuing the injunction, provided that TLCC posted a $800,000 bond. After the court denied Sandridge's motion to dissolve the injunction, Sandridge appealed.

We conclude Sandridge has failed to carry its burden of clearly showing the trial court abused its discretion in granting the injunction. In 1915, TLCC and Sandridge's predecessor in interest entered into an agreement "to settle completely all claims and matters between them." The agreement's stated purpose was to "set forth in full … all of the[ parties'] respective mutual rights and obligations" relating to the canal. Consequently, the resolution of the parties' dispute centers on the interpretation of the agreement. The agreement grants TLCC an interest in and to both the right of way itself and "the said canal now on said right of way" for the purpose "of repairing, replacing and in all ways maintaining such canal."

Based on the foregoing, we conclude the trial court did not err when it concluded TLCC demonstrated it was likely to prevail on the merits of its claim that Sandridge inappropriately invaded the canal. In particular, the proposed project would interfere with TLCC's right of "in all ways maintaining" the canal. The agreement could not have used "a more inclusive word" than "all." (*City of Ukiah v. Board of Trustees* (1961) 195 Cal.App.2d 344, 347.) Thus, Sandridge did not have any right to interfere in the

2.

maintenance of the canal, except as otherwise stated in the agreement, which did not expressly grant Sandridge's predecessor the right to cut cross the canal.

We therefore affirm the order granting the preliminary injunction.

## FACTS

### *Parties*

Sandridge Partners, L.P. (Sandridge Partners) is a limited partnership organized under California law with its primary place of business in Santa Clara County. Persons or entities each with more than a 10 percent ownership in Sandridge Partners include John Vidovich, Michael Vidovich, Stephen Vidovich, the Kathryn Tomaino Rev. Trust, and The Apricot Pit, LP. John Vidovich, LLC, a California limited liability company, is the general partner of the limited partnership and John Vidovich is the manager of the limited liability company. The limited partnership's chief operating officer and farm manager is Craig Andrew. Sandridge Partners owns and farms several locations in Kings County, raising pistachios, wheat, alfalfa, and cotton. One of its parcels (APN 026-230-010) is on the north side of the canal that is the subject of this litigation.

Roller Land Company, Inc., (Roller Land) is a California corporation that owns and farms land in Kings County. Sandridge Partners, Scott Stanton, and John Vidovich each have more than a 10 percent ownership interest in the corporation. Roller Land owns the parcel on the south side of the canal (APN 026-230-011). For ease of reference, this opinion usually refers to the parcels as being owned by Sandridge.

TLCC is a mutual water company with its headquarters in Kings County. Since November 2017, the president of TLCC's board of directors has been Mark Unruh, a registered mechanical and civil engineer. Unruh has been employed by cross-defendant J. G. Boswell Company since 2005. Cross-defendants J. G. Boswell Company and Wood Bros., Inc., are not parties to this appeal.

TLCC operates the Tulare Lake Canal, which is used for water deliveries to over 100,000 acres of agricultural land for approximately eight shareholders. The portion of

3.

the canal involved in this litigation is 60 feet wide and located on a 125-foot-wide right of way on land owned by Sandridge.

### *Interests in the Canal*

The parties' appellate briefing agrees that the respective rights and obligations of the parties with respect to the canal and its operation are established in an agreement made in 1915 to resolve a lawsuit (1915 Agreement). The parties to that agreement were TLCC, Empire Water Company (Empire Water), and Empire Investment Company (Empire Investment). Under the 1915 Agreement, TLCC and Empire Water transferred their rights associated with an old canal to Empire Investment. As a result, those rights merged into the fee title to the parcels held by Empire Investment. (See Civ. Code, §§ 805, 811.) Empire Investment then granted an undivided seven-eighths interest to TLCC and a one-eighth interest to Empire Water. Sandridge succeeded to all rights and interests in the parcels that Empire Investment retained under the 1915 Agreement. The parties disagree on the scope of the rights and obligations associated with the "interest" granted to TLCC and Empire Water by the 1915 Agreement. The agreement's relevant text is set forth and discussed in part II.C., *post*.

In 1943, the Stratford Irrigation District condemned Empire Water's one-eighth interest. Empire Investment was not a party to the condemnation proceeding and, as a result, its interests in the parcels were not affected by the condemnation. In 1971, Stratford Irrigation District assigned the one-eighth interest to TLCC. As a result, TLCC now owns 100 percent of the "interest" granted by the 1915 Agreement.

### *Sandridge's Pipeline Project*

Sandridge, as part of its agricultural operations, owns a water conveyance system that consists of ditches and pipelines. Sandridge is in the process of upgrading and expanding that system by constructing an underground 48-inch pipeline to transfer groundwater from wells it owns. Andrew's declaration asserts (1) the pipeline and an eight-inch sleeve will cross under one Sandridge parcel (APN 026-230-010), under the

4.

subsurface of the canal, onto to another parcel (APN 026-230-011) and beyond, and (2) all portions of the pipeline's trench, including where it crosses the canal, are being dug through land owned by Sandridge. The purpose of the sleeve is to avoid digging another trench in the event that Sandridge and the Stratford Public Utility District (SPUD) reach an agreement involving the transfer of the district's wastewater. For instance, treated wastewater might be taken by Sandridge for use elsewhere.

In November 2021, TLCC was made aware of the pipeline proposal. On January 12, 2022, TLCC responded with an e-mail by stating that, before the proposed pipeline could cross the canal, TLCC needed an agreement in place with the owner and operator of the pipeline that would address who would be responsible for its installation, operation and maintenance. On January 17, 2022, TLCC received a letter stating Sandridge intended to install the pipeline the next week, the pipeline would be used by Sandridge, Angiola Water District, and associated entities, and Sandridge and the water district "will hold TLCC harmless from any damages or interference with the use and operation of the canal." On January 18, 2022, TLCC received an e-mail with a draft of a common use and hold harmless agreement attached.

Andrew's declaration described how Sandridge proposed having the pipeline and sleeve cross under TLCC's canal. That process would involve "(1) digging the trench, (2) temporarily damming any minimal residual water in the canal, (3) installing the pipeline and sleeve, and (4) re-covering the pipeline and sleeve and testing for compaction." Andrew's declaration stated the work was scheduled to begin on January 26, 2022, and be completed within five days.

The parties did not finalize an agreement and, on January 26, 2022, TLCC placed heavy equipment on the banks of the canal in the path of the trench headed towards the canal. Unruh stated the equipment was placed in this blocking position when TLCC "realized that Sandridge and Roller Land were not about to be delayed by the rights of others before they trenched across the easement."

5.

Addressing the harm caused by stopping the project, Andrew asserted that if the pipeline's construction had not been interrupted, it would have been completed with water being delivered in the first or second week of March 2022. He also stated that if Sandridge was unable to meet that schedule, it would not have adequate water to irrigate approximately 2,000 acres already planted to wheat and 1,200 acres of planned cotton south of the Tulare Lake Canal. Andrew estimated the revenue from the planned crop at approximately $800 to $2,000 per acre and, thus, he calculated the losses from one season without the pipeline at approximately $800,000 to $2 million. In explaining the potential losses, Andrew's declarations did not address whether Sandridge had alternate uses for the groundwater that would have been delivered to the wheat fields and planned cotton, either in that growing season or subsequent seasons.[1]

## PROCEEDINGS

On January 25, 2022, TLCC filed a complaint for injunctive relief against Sandridge to stop construction of the pipeline across its right of way. This lawsuit was assigned case No. 22C-0019 by the Kings Superior Court and is referred to by the parties as the trespass action. Nine days later, TLCC filed a first amended verified complaint for injunctive relief, declaratory relief, and quiet title against Sandridge, which is TLCC's operative pleading for purposes of this appeal. The amended complaint alleged TLCC could not make water deliveries with a trench cut across its canal and, if errors are made in the pipeline's construction, TLCC might not be able to make future water deliveries to its shareholders, which could lead to multiple lawsuits against it. It also added new allegations that Sandridge was maintaining and operating a stormwater drainage system

---

[1]Use in subsequent seasons may be relevant to potential damages because Andrew did not assert the groundwater would be lost if not used in a particular season. Put another way, Andrew did not establish that groundwater must be used immediately because it (or its value) would be lost like flowing water that, if not used, would escape and not be available for subsequent use.

that included a pipe discharging potentially contaminated water into the canal without TLCC's permission.

Sandridge filed a cross-complaint for trespass, aiding and abetting trespass, and nuisance against TLCC and Wood Bros., Inc. J. G. Boswell Company was later added to the case as a Roe cross-defendant. The cross-complaint, which is not part of this appeal, requested an injunction requiring the removal of the equipment from the canal's banks, compensatory damages with interest, punitive damages, costs of suit, and attorney fees pursuant to Code of Civil Procedure sections 1021.5 and 1021.9.

In further proceedings, Sandridge pursued a temporary restraining order (TRO) and preliminary injunction. The hearing on the order to show cause regarding the preliminary injunction was scheduled for March 4, 2022.

On February 16, 2022, TLCC filed a petition for writ of mandate alleging the SPUD failed to comply with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) when the SPUD failed to conduct a preliminary review or determine a CEQA exemption applied before granting Sandridge an easement allowing the proposed pipeline to cross land owned by the SPUD. The Kings Superior Court assigned case No. 22C-0046 to the CEQA proceeding. In the CEQA proceeding, the trial court denied a preliminary injunction halting the construction of the pipeline and that denial is the subject of an appeal assigned case No. F084228 by this court.

On Saturday, February 26, 2022, Sandridge cut through the canal's banks, trenched through its floor, and installed coffer dams upstream and downstream of the work. Sheriff's deputies were called to the scene twice that day and halted further construction activity.

On March 1, 2022, TLCC filed an ex parte request for a TRO preventing Sandridge from trenching through Tulare Lake Canal to install the pipeline and sleeve. On March 2, 2022, after hearing argument from counsel, the trial court issued a TRO prohibiting Sandridge "from any excavation or construction of a trench on or in the canal

7.

claimed by [TLCC] in this case." The court also issued an order to show cause why a preliminary injunction should not issue, stating the TRO would remain in effect pending the March 4, 2022, hearing on the order to show cause.

On March 4, 2022, the court held a hearing on each side's request for injunctive relief in the trespass action and TLCC's request for a TRO in the CEQA proceeding. At the hearing, the parties agreed Sandridge would repair the cuts it had made into the canal. On March 7, 2022, the trial court declined to extend the TRO issued in favor of TLCC on March 2, 2022, and scheduled a hearing on the order to show cause regarding a preliminary injunction for March 23, 2022. The TRO was not extended because a restraining order had been issued in the CEQA proceeding that stopped the excavation or construction of a trench for the pipeline. The court also granted a preliminary injunction in favor of Sandridge that prohibited TLCC, Wood Bros., Inc., and J. G. Boswell Company from "[p]lacing any equipment, vehicles, or other objects on … properties [of Sandridge] in an effort to obstruct or prevent [them] from performing their contemplated construction project."

After the hearing on TLCC's application for a preliminary injunction, the trial court issued an April 4, 2022, order vacating the March 7, 2022, preliminary injunction against TLCC and others and enjoining Sandridge and its agents from "(1) trenching through and/or alteration of the channel/banks of the Canal or its rights-of-way, (2) interfering with TLCC's right to siphon under the Canal, (3) interfering with TLCC's exclusive right to maintain and operate the Canal, and/or (4) interfering with TLCC's transportation of water through the Canal to its shareholders." The order also directed TLCC to post a $800,000 bond.

Also on April 4, 2022, the court filed an order denying TLCC's application for a preliminary injunction in the CEQA proceeding and dissolving the TRO that had been issued in that case.

8.

On April 8, 2022, TLCC posted a $800,000 bond from Berkley Insurance Company in favor of Sandridge. The bond stated the premium charged was $8,000.

On May 20, 2022, Sandridge filed a motion to dissolve the preliminary injunction that asserted "neither the facts nor the supporting legal authority applicable to this case warrant a finding that … TLCC has an exclusive interest in the canal and that [Sandridge was] required to obtain approval from TLCC to perform work in the easement." The motion was supported by the declaration of Charles A. Hansen, an attorney with 45 years of experience in California real estate and title transactions. Hansen opined the canal is not a separate estate in land and consists of rights and obligations that together comprise a nonexclusive easement. The declaration, however, did not acknowledge and explicitly analyze the language in the 1915 Agreement granting TLCC an interest "in and to the said canal now on said right of way" or the language stating TLCC's interest was for the purpose of "repairing, replacing and *in all ways* maintaining such canal." (Italics added.)

TLCC filed an opposition to the motion to dissolve, and the motion was heard on May 31, 2022. On June 1, 2022, the trial court issued an order denying the motion.

On June 3, 2022, Sandridge filed a notice of appeal from the April 4, 2022, order granting the preliminary injunction and the June 1, 2022, order denying their motion to dissolve the injunction.

## DISCUSSION

### I. Basic Legal Principles

#### A. Interrelated Factors Test

Trial courts are authorized by Code of Civil Procedure section 526 to issue injunctions pending the outcome of a lawsuit. The statute lists seven circumstances when a preliminary injunction may be granted, including (1) when "the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action" (*id*., subd. (a)(2)); (2) when a party is doing or is

9.

threatening to do some act in violation of the rights of another party, which act would tend to render the judgment ineffectual (*id.*, subd. (a)(3)); or (3) when monetary compensation would be inadequate relief or extremely difficult to ascertain (*id.*, subds. (a)(4), (5)).

Preserving the status quo pending a determination on the merits of the action is the general purpose of a preliminary injunction. (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528.) Another principle significant to the final resolution of this lawsuit is that granting or denying a preliminary injunction is not an adjudication of the ultimate rights in controversy. (*Ibid.*)

"[A]s a general matter, the question whether a preliminary injunction should be granted involves two interrelated factors: (1) the likelihood that the plaintiff will prevail on the merits, and (2) the relative balance of harms that is likely to result from the granting or denial of interim injunctive relief." (*White v. Davis* (2003) 30 Cal.4th 528, 554; see *Butt v. State of California* (1992) 4 Cal.4th 668, 677–678.) Typically, the trial court's evaluation of the relative balance of harms compares the interim harm the plaintiff is likely to sustain if the injunction is denied to the harm the defendant is likely to suffer if the preliminary injunction is issued. (*White*, *supra*, at p. 554.) The potential-merit and interim-harm factors are described as *interrelated* factors because the greater the plaintiff's showing on one, the less must be shown on the other to obtain an injunction. (*Butt v. State of California*, *supra*, at p. 678.) Generally, weighing the factors lies within the trial court's discretion. (*County of Kern v. T.C.E.F.*, *Inc.* (2016) 246 Cal.App.4th 301, 315 (*T.C.E.F.*).)

The goal of this test is to minimize the harm that an erroneous interim decision would cause. (*White v. Davis*, *supra*, 30 Cal.4th at p. 554; *People v. Uber Technologies*, *Inc.* (2020) 56 Cal.App.5th 266, 284.) This goal also is served by the requirement that a deposit, bond, or undertaking be posted to protect the restrained party from the damage caused by a wrongfully issued injunction. (Code Civ. Proc., § 529.)

10.

## B. Standard of Review

Appellate review of a trial court's order granting or denying a motion for preliminary injunction generally is "limited to whether the trial court's decision was an abuse of discretion." (*Butt v. State of California*, *supra*, 4 Cal.4th at p. 678.) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711; see *T.C.E.F.*, *supra*, 246 Cal.App.4th at p. 316.) When the sufficiency of the evidence supporting the trial court's express and implied findings of fact is challenged, the deferential substantial evidence standard applies. (*Haraguchi*, at p. 711; *T.C.E.F.*, at p. 316; *Yu v. University of La Verne* (2011) 196 Cal.App.4th 779, 787.) When an appellant challenges the trial court's resolution of a question of law, that claim of error is reviewed de novo. (*Haraguchi*, at p. 712; *T.C.E.F.*, at p. 316.) Accordingly, "when the likelihood of prevailing on the merits depends on a question of law, an appellate court independently decides that question of law and, thus, whether there was a possibility of the moving party succeeding on the merits." (*T.C.E.F.*, at p. 317.) When the challenged determination involves the trial court's weighing of the interrelated factors, the result of that weighing process generally will be upheld on appeal so long as the trial court did not exceed the bounds of reason or contravene the court's express and implied factual findings. (*Id.* at p. 316.)

The party challenging the trial court's decision on an application for a preliminary injunction has the burden of making a clear showing of such an abuse of discretion. (*T.C.E.F.*, *supra*, 246 Cal.App.4th at p. 316.) When, as in this case, a trial court *grants* an application for a preliminary injunction, the restrained party need only show the trial court incorrectly determined either one of the two interrelated factors had been established. (*Id.* at p. 317; *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 749.)

11.

The appellant's burden to make a clear showing of an abuse of discretion is grounded in the well-established principles of the constitutional doctrine of reversible error. Under that doctrine, an order of the lower court is presumed correct—that is, all intendments and presumptions are indulged to support it on matters as to which the record is silent—and the appellant must affirmatively demonstrate prejudicial error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

## II.     Likelihood of Prevailing

The trial court set forth its reasoning for granting the preliminary injunction in its April 4, 2022, order and amended that reasoning in its June 1, 2022, order denying Sandridge's motion to dissolve the injunction.

### A.     Trial Court's Orders

The April order correctly stated the parties' dispute centered on "what rights are possessed by each party in connection with the Canal and the land upon which it sits." The order recounted the deeds and agreements predating the 1915 Agreement, the condemnation proceeding that transferred Empire Water's one-eighth interest to the Stratford Irrigation District, and TLCC's subsequent acquisition of that one-eighth interest from the Stratford Irrigation District. The order reached the broad conclusion that the condemned interest passed to TLCC "included an express and exclusive right to the Canal (including its workings and rights-of-way) and its operation and maintenance" along with "an exclusive right to 'syphon under said canal.'" The April order reiterated its determination of the rights held by TLCC by stating:

> "As the owner of the dominant estate with exclusive control over the Canal and its right-of-way, TLCC has at all times been vested with the right to conduct water through its Canal without any interference or obstruction by [Sandridge]. TLCC also has an exclusive right to control the manner in which the Canal is operated and maintained. TLCC further has an express right to syphon under the Canal without any interruption by [Sandridge]."

12.

Based on TLCC's right and duty to maintain the canal and its workings, the court stated "any alteration of the same by [Sandridge] must arguably be approved by TLCC."

The April order applied the interrelated factors test for preliminary injunctions and concluded (1) TLCC had demonstrated a likelihood of prevailing on its claim that it was inappropriate for Sandridge to cut into the banks of the canal without TLCC's permission, and (2) the weighing of the respective harms supported issuing a preliminary injunction upon TLCC's posting of an $800,000 bond. The preliminary injunction itself stated:

> "[Sandridge and its agents] or assigns, are hereby enjoined from undertaking any actions toward the end of installing an irrigation pipeline under the TLCC Canal which involves: (1) trenching through and/or alteration of the channel/banks of the Canal or its rights-of-way, (2) interfering with TLCC's right to siphon under the Canal, (3) interfering with TLCC's exclusive right to maintain and operate the Canal, and/or (4) interfering with TLCC's transportation of water through the Canal to its shareholders."

The trial court's June order denying the motion to dissolve the preliminary injunction set forth a narrower rationale for issuing the preliminary injunction and also tempered the trial court's earlier use of the term "exclusive." Despite this narrower rationale, we consider whether Sandridge has demonstrated the grounds set forth in the April 2022 order contains prejudicial error. In particular, we consider whether Sandridge has carried its burden on appeal and demonstrated TLCC did not have an exclusive right to maintain the canal.

### B. The Parties' Contentions

Sandridge contends the trial court abused its discretion by issuing the preliminary injunction because TLCC did not meet its burden of establishing (1) it was likely to prevail on the merits and (2) it would experience interim harm if the injunction were not granted. In Sandridge's view, TLCC only holds a nonexclusive right of way to transport water through a dirt canal (i.e., a ditch). Sandridge asserts there is nothing in the 1915

13.

Agreement, or any other agreement, stating the grant to the 125-foot-wide right of way was the grant of an exclusive right of way. Sandridge argues the rights of use retained by its predecessor, Empire Investment, as the fee title holder shows the grant of the right of way was never intended to be an exclusive grant.

In response, TLCC contends Sandridge misconstrues what part of the easement was and was not found to be exclusive by the trial court. TLCC interprets the trial court's decision as finding only "that the right to put a canal on the easement and maintain it rests in TLCC, exclusively, meaning Sandridge does not have a right to trench through the canal without permission."

### C.    TLCC's Express Right to Maintain

The parties are familiar with the history of the parcels, the old canal, and the documents that preceded the 1915 Agreement. Therefore, that history is not set forth in this opinion. We assume the one-eighth interest obtained by the Stratford Irrigation District from Empire Water pursuant to a 1943 final order of condemnation and transferred to TLCC in 1971 was not enlarged by the condemnation proceeding and, therefore, all of TLCC's various rights relating to the canal are derived from (1) the seventh-eighths interest TLCC acquired under the 1915 Agreement and (2) the one-eighth interest initially granted to Empire Water by the 1915 Agreement. Because TLCC now holds all eight-eighths of the interest, identifying TLCC's rights relating to the canal involves interpreting the 1915 Agreement.

The 1915 Agreement contains nine recitals that begin with "WHEREAS" and describe the deeds, rights of way, and other circumstances leading up to the agreement. The final recital states:

> "WHEREAS, the parties hereto desire by this agreement [(1)] to settle completely all claims and matters between them in relation to said old and new canals and to said weir, and [(2)] to substitute a new right of way for said canal in place of the old right of way mentioned in said deeds; [(3)] to fix accurately and define their respective rights in said canal, and the

14.

diversion of water through the same, and [(4)] to regulate the method of maintaining and operating said canal and the diversion of water through the same hereafter; and for all these purposes [(5)] to set forth in full in this agreement between the parties hereto all of their respective mutual rights and obligations in any of the premises."

The "FIRST" paragraph of the 1915 Agreement transfers all rights in the old right of way for a canal from TLCC and Empire Water to Empire Investment. Having acquired these rights, Empire Investment then granted the multifaceted "interest" that is the subject of this appeal. The "SECOND" paragraph of the 1915 Agreement states:

"[Empire Investment] shall grant and transfer and does by these presents grant and transfer to [TLCC] and [Empire Water], in the proportion of an undivided seven-eighths (7/8) *interest* to [TLCC], and an undivided one-eighth (1/8) *interest* to [Empire Water], *in and to a right of way* 125 feet in width, for the purpose of constructing and operating a sixty (60) ft. canal with the headgate therein and hereinafter mentioned, and also *in and to the said canal* now on said right of way, and of repairing, replacing and *in all ways maintaining such canal* and headgate to divert and distribute water from Kings River, in accordance with the terms, conditions, and provisions, and according to their respective interests, as hereinafter set forth; which said right of way is a strip of land 125 feet in width [with the boundary lines thereafter stated in the agreement]." (Italics added.)

The structure of this paragraph is unusual because the phrases "in and to a right of way" and "in and to the said canal" are separated by the prepositional phrase beginning "for the purpose of" rather than being next to one another. One way to interpret the paragraph is that one part of the "interest" granted is "in and to the right of way" together "with the headgate therein" and another part of the interest is "in and to the said canal now on said right of way." Also, the scope of the interest in these three things (i.e., the right of way, the headgate, and the canal) could be defined by the phrases (1) "for the purpose of constructing and operating" the canal and headgate and (2) for the purpose "of repairing, replacing and in all ways maintaining such canal and headgate."

15.

### 1. Principles Governing the Interpretation of the Interest Granted

Initially, we address what rules of law apply to the interpretation of the provisions in the 1915 Agreement. Sandridge's appellate briefing does not address this fundamental issue. Nonetheless, the issue was raised in the trial court proceedings.

TLCC argued the grant in the 1915 Agreement should be interpreted in favor of a grantee. (Civ. Code, § 1069.) Sandridge contended TLCC was inviting the court to expand the easement by asserting it was granted the ditch itself, argued that "Courts are reluctant to interpret easements beyond their express terms," and cited *Sarale v. Pacific Gas & Electric Co.* (2010) 189 Cal.App.4th 225, 245 (*Sarale*). TLCC's opposition to Sandridge's motion to dissolve the injunction referred to the following principles:

> "'Under section 806 of the Civil Code "the extent of a servitude is determined by the terms of the grant …"….' (*Pasadena v. California–Michigan etc. Co.* (1941) 17 Cal.2d 576, 578.) 'In construing an instrument conveying an easement, the rules applicable to the construction of deeds generally apply.' (*Scruby v. Vintage Grapevine, Inc.* [(1995)] 37 Cal.App.4th [697,] 702; see also Civ. Code, § 1066 [grants interpreted as contracts].) The instrument, 'unless it is ambiguous, must be construed by a consideration of its own terms. The meaning and intent thereof is a question of law and the reviewing court is not bound by the trial court's findings and conclusions regarding such intent and meaning. [Citations.]' (*Keeler v. Haky* (1958) 160 Cal.App.2d 471, 474.)" (*Gray v. McCormick* (2008) 167 Cal.App.4th 1019, 1024.)

This language also was quoted by the court in *Sarale*, *supra*, 189 Cal.App.4th at page 245. Based on the arguments and authorities presented in the trial court, we conclude (1) the parties' respective rights and obligations related to the canal are determined by the terms of the 1915 Agreement and (2) that agreement is to be construed pursuant to the rules set forth in *Gray v. McCormick* and repeated in *Sarale*. Those are the rules applicable to deeds and contracts generally. (See Civ. Code, § 1066.)

### 2. Traditional Framework for Interpreting a Document

The traditional framework (i.e., standard analysis) used to review a trial court's interpretation of a written contract is set forth in *Winet v. Price* (1992) 4 Cal.App.4th

16.

1159.  (See *Adams v. MHC Colony Park*, *L.P.* (2014) 224 Cal.App.4th 601, 620–621; *Scheenstra v. California Dairies*, *Inc.* (2013) 213 Cal.App.4th 370, 389–391 (*Scheenstra*).)

"The threshold question is whether the contract is ambiguous—that is, reasonably susceptible to more than one interpretation.  (*Winet v. Price*[, *supra*,] 4 Cal.App.4th 1159, 1165.)  The question of ambiguity is a question of law subject to independent review on appeal.  (*Ibid*.)  [¶] The analysis of ambiguity is not necessarily limited to the words of the contract.  Trial courts are required to receive provisionally any proffered extrinsic evidence that is relevant to show whether the contractual language is reasonably susceptible to a particular meaning.  (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39–40.)  Such extrinsic evidence might expose a latent ambiguity when the contract appears unambiguous on its face.  (*Id*. at p. 40 & fn. 8.)" (*Scheenstra*, *supra*, 213 Cal.App.4th at pp. 389–390.)

The appellate briefs submitted by the parties do not acknowledge the threshold question in contract interpretation is whether an ambiguity exists.  Moreover, the briefs do not even use the terms "ambiguity," "ambiguous," "unambiguous" or "reasonably susceptible."  Nonetheless, as a court of review, our responsibility is to apply the law of California (whether or not that law is explicitly acknowledged by the parties) and determine whether the trial court committed a prejudicial error.  Accordingly, our analysis of the meaning of the 1915 Agreement will apply the traditional framework for contract interpretation, beginning with the question of ambiguity.

In this case, the application of that framework is simplified because the parties have not relied on extrinsic evidence to establish the existence of an ambiguity or, more generally, to support a particular interpretation of the agreement's text.  "If no extrinsic evidence was presented or if the extrinsic evidence was not in conflict, the resolution of the ambiguity is a question of law, which is subject to independent review on appeal." (*Scheenstra*, *supra*, 213 Cal.App.4th at p. 390.)

17.

### 3. Ambiguity in the Right to Maintain the Canal

The 1915 Agreement granted TLCC an undivided "interest" "in and to a right of way" for the purpose of constructing and operating a canal with headgate "and of repairing, replacing, and in all ways maintaining such canal and headgate." Accordingly, in analyzing the scope of TLCC's right to maintain the canal, we consider whether the phrase "in all ways maintaining such canal and headgate" is ambiguous.

Initially, we consider whether the verb "maintaining" is susceptible to more than one interpretation. The appellate briefing does not address the meaning of this contractual term.

When attempting to ascertain the ordinary, usual meaning of a word, it is appropriate for courts to refer to dictionary definitions of that word. (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121–1122.) A dictionary defines the verb "maintain" to mean "**1 :** to keep in a state of repair, efficiency, or validity **:** preserve from failure or decline … [and] **2 a :** to sustain against opposition or danger." (Webster's 3d New Internat. Dict. (1993) p. 1362; see *Hoel v. City of Los Angeles* (1955) 136 Cal.App.2d 295, 304 ["'maintain' implies repair and upkeep"].) The dictionary definitions suggest there is more than one way to interpret the verb "maintaining" as it was used in the phrase "in all ways maintaining such canal and headgate." One interpretation is limited to the first dictionary definition quoted above. Under that interpretation, TLCC would have the right to keep the physical configuration of the canal—that is, its embankments above the water flow, the side walls of the channel that come in contact with flowing water, and the floor of the channel—in a condition that allows the canal to efficiently deliver water to TLCC's shareholders and to prevent the decline of that physical configuration. An alternative, broader interpretation combines both quoted definitions. Under that interpretation, TLCC also would have the right to sustain the canal against danger of whatever kind, which includes taking action (in court

18.

or otherwise) to protect the canal from any opposition or danger.  In this context, danger could include threats that have not yet resulted in actual physical harm.

Based on these alternate interpretations, we resolve the threshold legal question of ambiguity by concluding the verb "maintaining" is ambiguous—that is, the phrase is reasonably susceptible to more than one interpretation.

Next, we consider whether the modifier "in all ways" is ambiguous.  Sandridge's appellate briefing does not address the meaning of this contractual phrase.  TLCC's respondent's brief quotes the phrase three times but does not attempt to define it beyond contending it underlies the trial court's determination that TLCC's interest "included an express and exclusive right to the Canal (including its workings and rights-of-way) and its operation and maintenance."

The ordinary meaning of the word "'all'" is "'the whole of,'" "'the greatest quantity'" or "'every member or individual component thereof.'"  (*City of Ukiah v. Board of Trustees*, *supra*, 195 Cal.App.2d at p. 347.)  A drafter "could not have chosen a more inclusive word." (*Ibid*.)  A dictionary definition of "all" is "**1.** Wholly, entirely, or exclusively."  (Webster's New World Dict. (2d college ed. 1982) p. 36.)  Based on these definitions, we conclude the word "all" is not ambiguous.  The use of the words "inclusive" and "exclusively" in these definitions has an important impact on this appeal.

The dictionary definitions of the word "way" include "a course of action; method or manner of doing something *[do it this way]*."  (Webster's New World Dict., *supra*, pp. 1608–1609.)  In the context of the 1915 Agreement, we conclude the word "ways" is not ambiguous.  It means methods or manners.

### 4. *Resolving the Ambiguity*

The next step of our analysis of the meaning of the 1915 Agreement is to resolve the ambiguity about the scope of the verb "maintaining."  (See *Scheenstra*, *supra*, 213 Cal.App.4th at p. 390.)  No conflicting extrinsic evidence was presented by the parties

and, therefore, "the resolution of the ambiguity is a question of law, which is subject to independent review on appeal." (*Ibid*.) Stated another way, we treat "the interpretation of the written contract as solely a judicial function." (*Ibid*.)

When resolving an ambiguity, a court must consider the word or phrase in context. (*Adams v. MHC Colony Park, L.P.*, *supra*, 224 Cal.App.4th at p. 622.) In this case, that context includes the whole of the 1915 Agreement and the law as it existed at the time the agreement was drafted and signed. (See Civ. Code, §§ 1068 [when "operative words of a grant are doubtful, recourse may be had to its recitals to assist the construction"], 1641 [contract must be read as a whole], 1647 [contract may be explained by the circumstance under which it was made].)[2]

Part of the context for the 1915 Agreement's use of the phrase "in all ways maintaining" is the language that immediately precedes it. That language includes the verbs "repairing" and "replacing." Use of the verbs "repairing" and "replacing" reasonably support the inference that the verb "maintaining" has a broader meaning than repairing or replacing. Otherwise, it would be redundant. Interpreting it to be redundant would be contrary to Civil Code section 1641, which provides that "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." In addition, interpreting "maintaining" to mean only "repairing" and "replacing" also would be contrary to Civil Code section 1069, which provides that "[a] grant is to be interpreted in favor of the grantee, except that a reservation in any grant … is to be interpreted in favor of the grantor." (See *Dolnikov v. Ekizian* (2013) 222 Cal.App.4th 419, 428 [grant of an easement must be interpreted liberally in favor of the grantee]; *Pasadena v. California–*

---

[2]These Civil Code sections, along with section 805, 811, 1066, 1069, and 1643, which are cited elsewhere in this opinion, were enacted in 1872 and, therefore, were in existence when the 1915 Agreement was negotiated.

*Michigan etc. Co.*, *supra*, 17 Cal.2d at p. 579 [the grant gives the easement holder both "those interests expressed in the grant and those necessarily incident thereto"].)

Accordingly, we interpret the phrase "in all ways maintaining such canal" in its broadest sense. Thus, TLCC was granted the right (1) to keep the physical configuration of the canal in a condition that allows it to efficiently deliver water to TLCC's shareholders, (2) to prevent the decline of that physical configuration, and (3) to sustain the canal against danger of any kind, which includes taking action in court or otherwise to protect the canal. Under this interpretation of TLCC's right to maintain the canal "in all ways," TLCC has the right to seek injunctive relief to prevent physical harm to the canal and need not wait until such harm has occurred.

Next, we check this broad interpretation against the recitals in the 1915 Agreement. (Civ. Code, §§ 1068.) The last recital states the parties' desire "to settle completely all claims and matters between them in relation to said old and new canals and said weir, … to fix accurately and define their respective rights in said canal, … and to regulate the method of maintaining and operating said canal." To achieve these purposes, the parties attempted "to set forth in full … all of their respective mutual rights and obligations in any of the premises." The recital's phrases "settle completely *all* … matters" and "to set forth in full … *all* of their respective mutual rights and obligations" support the inference that TLCC was granted every component of the right to maintain the canal and headgate, except as explicitly stated in the agreement.[3] Because the 1915 Agreement did not set forth any right of Empire Investment to maintain the canal or interfere with TLCC's maintenance of the canal, it follows that TLCC was granted the exclusive right to maintain the canal, except as explicitly stated otherwise.

---

[3]This exception is derived from the clause in the "<u>SECOND</u>" paragraph of the 1915 Agreement stating the interest granted is "in accordance with the terms, conditions, and provisions, and according to their respective interests, as hereinafter set forth."

21.

As applied to the facts of this case, TLCC's right is exclusive in the sense that Sandridge, as Empire Investment's successor in interest, does not have the right to interfere with TLCC's upkeep of the canal's physical condition to allow the efficient delivery of water to TLCC's shareholders or TLCC's protecting the canal from any threat or danger, such as the possibility of Sandridge cutting a trench across the canal. Accordingly, we conclude the trial court did not err in interpreting TLCC's right to maintain the canal as "exclusive" in that sense.

### 5.  *Sandridge's Interpretation*

Having conducted an independent analysis and resolved the ambiguity in the 1915 Agreement, we consider the question from a different perspective—namely, whether Sandridge carried its burden as appellant and demonstrated the trial court erred in interpreting the phrase "in all ways maintaining such canal" so broadly.  In its appellate briefing, Sandridge made the tactical choice of not providing a direct, explicit analysis of that contractual phrase.  In particular, Sandridge and its expert, Charles A. Hansen, offered no interpretation of the word "maintaining," the modifying phrase "in all ways," or the phrases in the recital that use the word "all."  Consequently, Sandridge has failed to convince us that the foregoing interpretation is wrong.

We note that Sandridge's appellate briefing relies heavily on case law involving easements.  The usefulness of such cases is limited when the fundamental question here involves the interpretation of the terms of a contract, and those cases do not address the meaning of the contractual language at issue in this appeal.  "It is fundamental that the language of a grant of an easement determines the scope of the easement."  (*County of Sacramento v. Pacific Gas & Elec. Co.* (1987) 193 Cal.App.3d 300, 313.)

### 6.  *Another Ambiguity*

Based on the foregoing interpretation of TLCC's right to maintain the canal, we need not address another ambiguity in the 1915 Agreement's text that granted TLCC its

"interest." That text granted TLCC an "interest … in and to the said canal now on said right of way." Exactly what rights are embodied in that "interest" and what corresponding obligations were imposed on the servient estate held by Sandridge is unclear.

We recognize that Sandridge has argued "the conveyance of a right-of-way in a ditch only gives the grantee 'a right of way for the passage of water.' (*Cairns v. Haddock* (1922) 60 Cal.App. 83, 93. See also *McCarty v. Southern Pacific Co.* (1905) 148 Cal. 211, 221–222 [conveyance of a levee is not a conveyance of land but, rather, conveyance of an easement].)" This argument is off point because the 1915 Agreement addresses the "interest … in and to a right of way 125 feet in width" separately from the interest "in and to the said canal." Thus, the "interest" granted in and to the canal appears to transfer something more than just a right of way. Otherwise, the grant of an interest in and to the canal would be surplusage. (See Civ. Code, §§ 1069, 1641.)

### 7.    *Summary*

Based on the foregoing, we conclude the trial court did not err when it concluded TLCC demonstrated it was likely to prevail on the merits of its claim that Sandridge inappropriately invaded the canal. In particular, the proposed project would interfere with TLCC's right to "in all ways" maintain the canal. The parties to the 1915 Agreement could not have chosen a more inclusive word than "all." (*City of Ukiah v. Board of Trustees*, *supra*, 195 Cal.App.2d at p. 347.) The inclusiveness of the word excluded Sandridge from having any right to interfere in the maintenance of the canal, except as otherwise stated in the agreement, which did not expressly grant Sandridge's predecessor the right to cut cross the canal.

### III. Relative Balance of Harms

#### A. Trial Court's Decision

After concluding TLCC was likely to prevail on the merits, the trial court examined the respective interim harms and determined the weighing of those harms supported the issuance of a preliminary injunction conditioned upon the posting of a $800,000 bond. The court stated that granting the injunction appeared to be the only means by which TLCC could maintain the status quo and keep its interest in the canal and right of way free from alteration or trespass by Sandridge. The court evaluated Sandridge's evidence and concluded its "alleged potential damages are overstated." The court stated it was "aware that the monetary losses claimed by [Sandridge] are more concrete than TLCC's less pecuniary damages." Interpreting the order in accordance with the applicable principles of appellate review (*Denham v. Superior Court*, *supra*, 2 Cal.3d at p. 564), we conclude the foregoing statement refers to the statutory factor of whether monetary compensation would be inadequate relief or extremely difficult to ascertain. (Code Civ. Proc., § 526, subd. (a)(4), (5).) The court also referred to the principle that the stronger the showing of a likelihood of success on the merits, the balance of harms did not necessarily need to tip in favor of the party seeking the injunction. (See *Butt v. State of California*, *supra*, 4 Cal.4th at p. 678; *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 447.)

#### B. Sandridge's Claims of Error

Sandridge contends the trial court abused its discretion by not properly balancing the harms. First, Sandridge argues TLCC will not suffer any harm because Sandridge's "unrebutted evidence has made it clear the project will only take place during a time period when the canal is not being used to transport water." Second, Sandridge argues the balance of harms tips in its favor, TLCC is not likely to prevail on the merits and, therefore, the injunction should have been denied.

24.

### 1. *Lack of Harm to TLCC*

The trial court's June 2022 order addressed how TLCC was exercising its right to use the canal and the timing of that use by noting that, at the May 31, 2022, hearing on the motion to dissolve the preliminary injunction, counsel for Sandridge "admitted that nobody (TLCC or [Sandridge]) knew when/if water was going to be released into the Canal." The court addressed when possible water releases might occur by quoting Craig Andrew's declaration, which asserted "'TLCC historically moves its water through the ditch for delivery in the Spring months to the other farms who need water for crop irrigation.'" Based on Andrew's declaration and other evidence, the court stated it was "reasonable to assume that because the Canal could be the subject of a water release at any time, the ends of justice actually support keeping the preliminary injunction in place." In light of the timing of the April 2022 order granting the preliminary injunction and the June order refusing to dissolve it, we interpret the phrase "a water release at any time" to mean any time during the spring.

The June order addressed Sandridge's interference with TLCC's use of the canal by stating the evidence established Sandridge's trenching across the canal would require the placement of gates or other matters that would interfere, albeit temporarily, with TLCC's use of the canal for transporting water to its shareholders. The order stated that use was "the express purpose for which the easement was initially created and has since always been maintained."

We conclude that substantial evidence supports the trial court's finding that TLCC could suffer harm if its use and operation of the canal was interrupted during the spring. This conclusion leads to Sandridge's contention that its unrebutted evidence made it clear the project would only take place during a time period when the canal is not being used to transport water. The problem with this factual assertion as to what will happen in the future is that, under the applicable rules of appellate procedure, this court must conclude the trial court impliedly rejected it. In other words, the court found the assertion was not

25.

credible. Sandridge has presented no argument or authority explaining on what basis this court may overturn the implied credibility finding.

When a trial court expressly or impliedly finds all or part of a witness's testimony is not credible, appellate courts must accept that finding "if there [wa]s any rational ground for" the trial court to disbelieve that testimony. (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043.) Rational grounds for disbelieving a witness include the factors listed in Evidence Code section 780, such as the witness's interest in the matter. (Evid. Code, § 780, subd. (f); see *Pierce v. Wright* (1953) 117 Cal.App.2d 718, 723.) Therefore, assuming Sandridge actually presented evidence as to its future intent regarding the timing of its project in relation to TLCC's use of the canal, the trial court had a rational ground for disbelieving it. Therefore, we must defer to that credibility finding.

Furthermore, Sandridge's appellate briefing does not identify, and our review of the papers filed in the trial court has not located, any request by Sandridge to lift the injunction for a particular period when the canal would not be in use. As a result, we cannot fault the trial court for failing to include such a provision in the injunction itself or in the June order denying the motion to dissolve the injunction.

### 2. *Balancing of Respective Harms*

Sandridge's contentions about the erroneous balancing of harms implicates the legal principle that "when the challenged determination involves the trial court's weighing of the interrelated factors, the result of that weighing process generally will be upheld on appeal so long as the trial court did not exceed the bounds of reason or contravene the uncontradicted evidence." (*T.C.E.F.*, *supra*, 246 Cal.App.4th at p. 316.) Sandridge's challenge to the balance struck by the trial court is based on its contention that TLCC is unlikely to prevail on the merits of its claim. That contention has been rejected in part II, *ante*. Accordingly, Sandridge has failed to show that the trial court exceeded the bounds of reason in its balancing of the interrelated factors.

## DISPOSITION

The April 4, 2022, order granting TLCC's application for a preliminary injunction is affirmed.  The June 1, 2022 order denying the motion to dissolve the preliminary injunction is affirmed.

TLCC shall recover its costs on appeal.

PEÑA, J.

WE CONCUR:


DETJEN, Acting P. J.


MEEHAN, J.

27.